# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEREK MICHAEL WOODEN, | 1:06-CV-00529 AWI GSA HC |
| Petitioner, | |
| v. | FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS |
| A. K. SCRIBNER, | |
| Respondent. | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**BACKGROUND**

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Tuolumne, following his conviction by jury trial on November 14, 2003, of first degree murder (Cal. Penal Code § 187) and attempted murder (Cal. Penal Code §§ 187/664). (CT[1] 206-207.) On December 17, 2003, Petitioner was sentenced to serve a total indeterminate term of thirty-four years to life in state prison. (CT 357.)

Petitioner filed a notice of appeal to the California Court of Appeals, Fifth Appellate District

---

[1] "CT" refers to the Clerk's Transcript on Appeal.

1  (hereinafter "Fifth DCA"). On May 31, 2005, the Fifth DCA affirmed the judgment. (LD[2] 4.)
2  Petitioner then filed a petition for review in the California Supreme Court. (LD 5.) The California
3  Supreme Court denied the petition on August 10, 2005, stating: "Petition for review denied without
4  prejudice to any relief to which defendant might be entitled upon finality of *People v. Black,* (2005)
5  35 Cal.4th 1238 regarding the effect of *Blakely v. Washington* (2004) 542 U.S. ___, 124 S.Ct. 2531,
6  and *United States v. Booker* (2005) 543 U.S. ___, 125 S.Ct. 738, on California law." (LD 6.)

On June 19, 2006, Petitioner filed the instant first amended federal petition for writ of habeas corpus. Petitioner presents the following grounds for relief: 1) "The prosecutor offered lesser charges after it was agreed he wouldn't there by possibly damaging my alibi defense"; and 2) "I was sentenced to 9 years for attempted murder incorrectly." On September 29, 2006, Respondent filed an answer to the petition. Petitioner did not file a traverse.

## FACTUAL BACKGROUND[3]

During Christmas of 2002, Jeffrey Zehnder and Petitioner, who went by the name, "Woody," had a conversation about where to buy marijuana, and Zehnder mentioned his friend Donald Hopkins. Petitioner said, "Fuck that nigger. I want to roll on him," which Zehnder interpreted to mean Petitioner wanted to rob Hopkins.

Hopkins lived in an apartment in Jamestown with his girlfriend Melissa Berry and Berry's four-year-old daughter. Hopkins and Berry had been dealing marijuana and methamphetamine out of their apartment for a year and a half. Petitioner had bought marijuana and methamphetamine on a daily basis from Hopkins and Berry since December.

In mid-January 2003, Zehnder and his girlfriend, Peggy Rice, moved in with Hopkins and Berry. On January 26, Rice, Zehnder, Hopkins and Berry had one last celebration before Zehnder was to return to prison the next day. Zehnder, Hopkins and Berry smoked a quarter- to a half-gram of methamphetamine. At some point during the evening, Petitioner came over to purchase some marijuana and then left.

---

[2] "LD" refers to the documents lodged by Respondent with the answer.

[3] The facts are derived from the factual summary set forth by the Fifth DCA in its opinion of May 31, 2005, and are presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1). (LD 4 at pp. 2-6.)

1 Hopkins fell asleep. Cindy Steele came by the apartment and she and Berry smoked more
2 methamphetamine. Both were "high." Steele warned Berry to be careful, as people were watching,
3 and to be particularly careful of a customer named Randy. Berry told Zehnder what Steele had said,
4 but he told her to ignore it because Steele was "tweaking." Zehnder and Rice left the apartment.
5 Berry then woke Hopkins because she was afraid, but he downplayed the warning and the two went
6 to bed.

7 Tiffany Palmer lived in an apartment across the hall and below Hopkins and Berry. When
8 Justin Delfino left Palmer's apartment at close to midnight on January 26, 2003, he heard voices of
9 two men talking in a playground 100 feet away.

10 After Delfino left, Palmer was awakened by what sounded like a baseball bat hitting a car
11 five or six times. She looked out the window and saw two men run by in the parking lot. They were
12 wearing dark clothing and one had on a ski mask. As the men ran, one dropped a small caliber
13 handgun holster. Palmer called the police. She opened her window and heard a female voice crying
14 for help.

15 Palmer stepped outside her apartment and found a baseball bat at the bottom of the stairs. Up
16 the stairs, Palmer saw an open apartment door. She stepped inside and saw blood on the walls. She
17 found Berry sitting on the toilet and covered with blood. Palmer left the apartment to again call the
18 police, and when she returned, Berry was on the floor. Palmer saw Hopkin's body in the bedroom
19 doorway.

20 The door to Hopkins' and Berry's apartment had been kicked open. The bedroom had been
21 ransacked and there were signs of struggle. Two sets of closet doors were broken and off their
22 hinges. The bedroom door was partially blocked by a three-drawer dresser. Five spent .22 casings
23 were found in the bedroom, and cash as well as many baggies of marijuana were found in a
24 nightstand.

25 Hopkins died of a .22-caliber gunshot wound to the head. Berry also had been shot in the
26 head. She had bullet fragments in her head and a hematoma in her brain. Her injuries required
27 surgery, but she did survive.

28 A day after the incident and following surgery, Berry told an investigator that it was "Moody"

who shot her. When the officer repeated the name, Berry became frustrated and said "no." Eventually Berry said "Woody" and gave a physical description of him as a young, white male, 20 to 21 years old, five-foot-nine and skinny.

Berry identified Stephen Myers and Petitioner from a photo lineup several days after the incident. Berry was interviewed several times and transcripts of the interviews were given to the jury. In the first interview, February 4, 2003, Berry stated Steele had told her to be careful because people were upset that she and Hopkins were making too much money selling drugs. Berry recalled that, on the day of the incident, two men came into the bedroom in the early morning hours and attacked Hopkins. She remembered gunshots and then being in the bathroom and not able to get up. Although reminded that she had picked out several suspects from a lineup, Berry stated she did not recognize anyone.

In the second interview, February 25, 2003, Berry stated that Petitioner came to her apartment daily for two weeks before the murder, including the evening of the murder. When Steele came to her apartment and gave Berry the warnings, she appeared "spooked." Berry woke Hopkins to convey the warning, but Hopkins went back to sleep. Berry and Hopkins were attacked in their bedroom and shots were fired. Berry stated Petitioner took his mask off and looked at her, not realizing that she was not dead.

In the third interview, April 2, 2003, Berry stated she and Hopkins were asleep when someone banged on the front door. Two men came in and one of them with a black ski mask began fighting with Hopkins. Later, when the man pulled back the ski mask, she saw that it was Petitioner. Berry stated that it was "the other person" that shot Hopkins, but she did not know for sure whether Petitioner had a gun. Berry saw Petitioner rummaging through items in the bedroom after she opened her eyes. She did not think Petitioner saw her look at him because she was not shot again. Berry testified that both marijuana and methamphetamine, as well as cash, were stored in the bedroom.

A fourth and final interview was conducted October 24, 2003. At that time Berry stated that, when she woke up, invaders were entering the bedroom, and Hopkins fought with a masked man she identified as Petitioner.

Berry testified at trial that she and Hopkins had been dealing marijuana and

methamphetamine for over a year before the murder. The methamphetamine was kept in a shoe box in the bedroom and the marijuana in a nightstand. Petitioner came to the apartment on the evening in question to buy marijuana. Later, Steele came to the apartment to purchase drugs and warn Berry of possible danger, but both Zehnder and Hopkins shrugged it off. Berry woke to find Hopkins fighting with a masked person in their bedroom. She went to help Hopkins, but passed out. When she came to, she saw Petitioner, who had partially removed his mask. Berry was positive that it was Petitioner in the bedroom. During the incident, when she was conscious, Berry worried about her four-year-old daughter, who was in another bedroom.

The neurosurgeon who treated Berry for her brain injury explained that a part of Berry's brain had to be removed, due to the gunshot wounds, but it was a "noneloquent" part and its removal would not greatly interfere with brain function. Though Berry was "in somewhat of a coma" in the first few days following the surgery, "she all of a sudden woke up" and began talking. At first her speech was impaired, but it improved steadily over time. Berry did not suffer from the type of injury that would interfere with her ability to express what had happened to her and who did it. The neurosurgeon explained that it was "fairly common" for an individual with a traumatic head injury to begin recalling more detail in the weeks and months after the injury.

**Defense**

A number of people testified that they saw Petitioner on the day in question, which happened to be Super Bowl Sunday. Brandon Stearns testified that he picked up Petitioner at 11:00 a.m., they went to Stearns's parents' house, and after lunch, Stearns loaned Petitioner his truck. Following the football game, Stearns called Petitioner to pick him up, and the two went to a friend's house to work on the truck. Eventually, the two returned to Stearns's parents' house and smoked methamphetamine. At approximately 1:30 a.m., Stearns went to see his estranged wife, and Petitioner was still in Stearns's parents' garage when Stearns returned. Early the next day, the two went to Columbia to buy methamphetamine. As they smoked the methamphetamine, they heard about a shooting in Jamestown and Petitioner said, "There goes my gun."

The following Tuesday, Stearns was arrested on a felony drug court warrant. In an interview, he denied Petitioner was involved in the murder of Hopkins, telling the officer the two of them had

watched the Super Bowl game together. At trial, Stearns said he and Petitioner had planned to watch the Super Bowl game together, but didn't. Stearns admitted he sometimes hallucinated after using methamphetamine.

Stearns's wife testified that she saw Petitioner at 7:00 p.m. on January 26, 2003, driving her husband's truck and asked him where Stearns was. Dawn Tresenrider was housesitting for Stearns's parents while they were on vacation. She spoke to Petitioner in the garage of the house sometime after 9:30 p.m. on January 26. He was sitting in Stearns's pickup truck waiting for Stearns to return. Tresenrider noticed the Stearns's family car was gone.

## DISCUSSION

**I. Jurisdiction**

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. In addition, the conviction challenged arises out of the Tuolumne County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 2241(d). Accordingly, the Court has jurisdiction over the action.

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

**II. Legal Standard of Review**

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death Penalty Act which became effective on April 24, 1996.  <u>Lockyer v. Andrade</u>, 538 U.S. 63, 70 (2003).  Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); <u>see</u> <u>Lockyer</u>, 538 U.S. at 70-71; <u>see</u> <u>Williams</u>, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" <u>Lockyer</u>, 538 U.S. at 71, *quoting* 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." <u>Id</u>., *quoting* <u>Williams</u>, 592 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." <u>Id</u>.

Finally, this Court must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." <u>Lockyer</u>, 538 U.S. at 72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." <u>Williams</u>, 529 U.S. at 413; <u>see also</u> <u>Lockyer</u>, 538 U.S. at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Williams</u>, 529 U.S. at 413.

"[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." <u>Id</u>. at 411.  A federal habeas court making the "unreasonable application" inquiry should ask whether the state

U.S. District Court
E. D. California                    cd                                          7

court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. See Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

AEDPA requires that we give considerable deference to state court decisions. The state court's factual findings are presumed correct, 28 U.S.C. § 2254(e)(1), and we are bound by a state's interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir.2002), *cert. denied*, 537 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

**III.  Review of Petition**

   **A.  Ground One**

In his first ground for relief, Petitioner claims "[t]he prosecutor offered lesser charges after it was agreed he wouldn't there by possibly damaging my alibi defense." He argues that "[t]his was a simple 'murder in the first or nothing,' and the prosecutor offered up second degree murder and manslaughter charges when it was earlier agreed he wouldn't."

   1.  Review by State Courts

The claim was first presented on direct appeal to the Fifth DCA. On May 31, 2005, the Fifth DCA denied the claim in a reasoned opinion. (LD 4.) Petitioner then filed a petition for review in the California Supreme Court. (LD 5.) The petition was denied on August 10, 2005. (LD 6.) The California Supreme Court, by its "silent order" denying review of the Fifth DCA's decision, is presumed to have denied the claims presented for the same reasons stated in the opinion of the Fifth DCA. Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).

The appellate court analyzed and rejected the claim as follows:

> [Petitioner] contends the trial court erred prejudicially when it instructed, over objection, on second degree murder and manslaughter. Respondent disagrees, as do we.
>
> The record shows the following. The parties and the court spent two hours going over jury instructions and agreed "[t]his is either a murder in the first or it's not at all." Several

days later, "the day before the trial [was] ready to wrap up," the prosecutor presented the court with "20 pages of new instructions" involving lesser included offenses to first degree murder. The trial court asked defense counsel what his position was on "the lesser includeds." Counsel objected to their use, stating no evidence had been presented to warrant them. When asked if this opposition to the instructions was a tactical decision, defense counsel stated it was, as he did not think Petitioner would be convicted of first degree murder. Petitioner agreed with this decision.

The trial court asked the prosecutor what evidence would warrant the giving of the instructions. Requesting that the instructions be given over defense objection, the prosecutor argued the jury

> may find that [Petitioner] entered into the Hopkins apartment with malice aforethought, that is doing an intentional act that was dangerous to human life. But, if they're unable to find deliberation and premeditation, that is second degree murder. [¶] Finally, there is a possibility that a jury could look at this situation and find that Hopkins was killed, the killing was unlawful, and that the perpetrator of the killing, and in this case, under aider and abettor theory, acted in conscious disregard for human life and that conduct resulted in unlawful killing. [¶] For example, it could be that they go into the apartment, there is a fight. Hopkins is getting the upper hand in that fight, and the perpetrator fires the gun, simply to break up the fight and get some distance to leave . . . . [T]hat would be voluntary manslaughter.

Defense counsel asked for a 24-hour continuance in order to brief why the lesser included offense instructions should not be given. Denying a continuance, the trial court stated, "I can't imagine that an appellate court would find it improper to give them the instructions over your objection. I think it's much more likely they would find it improper to not give them . . . . [¶] . . . [¶] . . . I'm not crazy about doing this, but I will do it." Thereafter, the jury was instructed on murder and the lesser included offenses of second degree murder and voluntary manslaughter. [footnote omitted.]

[Petitioner] contends these instructions prejudiced him by confusing the jury and infringing on his federal constitutional rights to a fair trial and due process. Specifically, [Petitioner] claims there was no evidence to justify the giving of the lesser included offense instructions, and to have done so 'posed a serious potential for jury confusion' by, in essence, negating his alibi defense. As argued by [Petitioner], the giving of the lesser included offense instructions left the jury with the inference that his defense depended on 'the kind of trickery and legal technicality that would anger a jury.'

> [T]he objected-to instructions had the effect of advising the jury it could still find [Petitioner] guilty (albeit of a lesser offense), if it believed he was presenting the jury with an alternate defense to his 'alibi' defense ('if you don't believe I was somewhere else, and you believe I was there, then the unexpected struggle with Hopkins mitigates my culpability to voluntary manslaughter.')

As evidence of this prejudice, [Petitioner] points to what he contends was a short amount of time the jury took to reach a verdict (approximately eight hours), and the rejections of what he labels a "well-supported alibi defense."

We find [Petitioner]'s arguments unpersuasive.

[Petitioner] was charged with first degree murder. In both opening and closing argument, first degree murder was presented to the jury on two theories: primarily on the theory of felony murder in the course of a burglary or robbery but also on a theory of premeditated and deliberated murder. Neither party suggested conviction on any lesser

9

included offense.

Second degree murder and voluntary manslaughter are lesser included degrees or offenses of first degree murder. [Citation.] "The trial court has a sua sponte duty to instruct on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present and there is evidence that would justify a conviction of such a lesser offense." [Citation.] This sua sponte duty exists even if the lesser offense is inconsistent with the theory of defense elected by the defendant, or the defendant specifically requests that the jury not be instructed on lesser included offenses. [Citation.] At the same time, "[i]t is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case." [Citation.] However, such error is one "of state law subject to the traditional *Watson* test [for prejudice]. [Citation.] "In most cases an error of this sort is harmless." [Citation.]

[Petitioner]'s assertion of prejudice depends on the premise that the jury would have blamed [Petitioner] for the "trickery" involved in giving inapplicable instructions and, for that reason, rejected his alibi defense. This, however, is pure speculation if not imagination.[4] There is absolutely nothing in the record that supports it. If the jury's eight-hour deliberations were quick, a proposition we find dubious, that simply shows the jury was not confused. If [Petitioner]'s alibi evidence was strong, that merely negates the idea that the jury must have thought [Petitioner] was hedging his bets.

We also reject [Petitioner]'s two federal due process claims. The first is his very brief contention that the lesser offense instructions were so misleading and confusing as to cause "an imprecise, arbitrary, or insupportable finding of guilt." [Citation.] [Petitioner]'s reliance on *Baldwin* for this proposition is unavailing. *Baldwin* involved a Louisiana prisoner sentenced to death for murder. The instructions at the guilt phase of the trial did not charge that aggravating circumstances must be found as an element of first degree murder. The court in *Baldwin* stated the defendant may be entitled to relief, "[i]f the instructions given the jury were likely to cause an imprecise, arbitrary, or insupportable finding of guilt on the charge of first degree murder . . . ." [Citation.] However, the court found that the jury was directed to find the aggravated circumstance in the sentencing portion of trial, and no harm resulted from the irregularity in the instruction. [Citation.] Although [Petitioner] claims the instructions here were misleading and confusing, we disagree and find the instructions as given did not lead to an "imprecise, arbitrary, or insupportable finding of guilt. [Citation.]

His second due process claim is also without merit. [Petitioner] relies on *Sheppard v. Rees* (9th Cir.1990) 909 F.2d 1234 for the proposition that he was not given adequate notice of the additional theories of culpability. In *Sheppard*, the defendant was charged with one count of murder. [Citation.] No mention was made of felony murder or the underlying robbery in the information. [Citation.] The case was tried on the theory that the killing was premeditated and deliberate. At no time during trial or the instruction conference was the theory of felony murder mentioned. Nevertheless, the trial court instructed the jury on a felony-murder theory, and the prosecution argued that theory to the jury during closing argument. [Citation.] The jury convicted the defendant of first degree murder, rendering a general verdict without indicating a legal theory on which it relied. [Citation.] The court in *Sheppard* found constitutional error of a fundamental nature, as the defendant had no opportunity to present his own evidence on felony murder. "Where two theories of culpability are submitted to the jury, one correct and the other incorrect, it is impossible to tell which

---

[4] In fact, we note that CALJIC No. 17.31 was also given. That instruction states, in relevant part, "The purpose of the court's instructions is to provide you with the applicable law so that you may arrive at a just and lawful verdict. Whether some instructions apply will depend upon what you find to be the facts. Disregard any instruction which applies to facts determined by you not to exist . . . ."

> theory of culpability the jury followed in reaching a general verdict." [Citation.]
>
> Here, while the theories of second degree murder and manslaughter were not included in [Petitioner]'s charging documents or in argument at trial, neither was he convicted on either theory. Instead, he was convicted of first degree murder, a charge of which he had notice. *Sheppard v. Rees* is simply inapposite.
>
> We reject [Petitioner]'s argument that his due process rights were violated.

(LD 4 at pp. 6-10.)

### 2. Applicable Federal Law

As a preliminary matter, the court notes that an allegation that a jury instruction is incorrect under state law does not form a basis for federal habeas corpus relief. Estelle v. McGuire, 502 U.S. 62, 67 (1991) ("We have stated many times that federal habeas corpus relief does not lie for errors of state law."). To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. Id. at 72. A habeas court must not merely consider whether an "instruction is undesirable, erroneous, or even universally condemned"; rather, the court must consider "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" Henderson v. Kibbe, 431 U.S. 145, 154 (1977), *quoting* Cupp v. Naughten, 414 U.S. 141, 146-47 (1973). Even if it is determined that the instruction violated the petitioner's right to due process, a petitioner can only obtain relief if the unconstitutional instruction had a substantial influence on the conviction and thereby resulted in actual prejudice under Brecht v. Abrahamson, 507 U.S. 619, 637 (1993). California v. Roy, 519 U.S. 2, 5 (1996) (challenge in habeas to the trial court's jury instructions is reviewed under the Brecht standard, i.e., *whether the error had a substantial and injurious effect or influence in determining the jury's verdict*). The court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. See United States v. Frady, 456 U.S. 152, 169 (1982), *citing* Cupp v. Naughten, 414 U.S. at 146-47.

### 3. Analysis of Claim

This Court is unaware of any Supreme Court precedent which forbids the giving of lesser-included offense instructions where there was evidence supporting the elements of the lesser-included offense. In fact, the Supreme Court has held "it has long been 'beyond dispute that the

1  defendant is entitled to an instruction on a lesser included offense if the evidence would permit a jury
2  rationally to find him guilty of the lesser offense and acquit him of the greater.'" Beck v. Alabama,
3  447 U.S. 625, 635 (1980), *quoting* Keeble v. United States, 412 U.S. 205, 208 (1973). Given the
4  prosecutor's arguments that there was evidence from which the jury could acquit Petitioner of first
5  degree murder and convict him of a lesser degree of murder, the trial court acted consistent with
6  Supreme Court precedent in giving these instructions. It cannot be said that the state court acted
7  unreasonably.

8       In addition, there is simply no support in the record for Petitioner's proposition that the trial
9  court's instruction on second degree murder and manslaughter caused the jury to reject his alibi
10 defense because it blamed him for "trickery." As noted by the appellate court, this argument "is pure
11 speculation if not imagination." (LD 4 at p. 9.) Moreover, the jury was instructed pursuant to
12 CALJIC No. 17.31 that it should disregard any instruction that did not apply to the facts.  There is
13 also no support for Petitioner's argument that the jury was confused. Indeed, Petitioner's own
14 argument that the jury reached a verdict quickly undercuts his contention. Finally, Petitioner cannot
15 demonstrate prejudice resulting from the alleged error. He was not convicted of second degree
16 murder or manslaughter; he was convicted of first degree murder. Accordingly, the claim should be
17 denied.

18 **B.  Ground Two**

19      Petitioner next claims he was improperly sentenced to nine years for attempted murder,
20 because he asserts the maximum term he could be sentenced to was seven years. This claim is
21 patently without merit. Pursuant to Cal. Penal Code §§ 187/664, the punishment for attempted
22 murder is five, seven, or nine years. Therefore, Petitioner's claim that the nine-year sentence was
23 statutorily unauthorized must be rejected.

**RECOMMENDATION**

25      Accordingly, the Court RECOMMENDS that the petition for writ of habeas corpus be
26 DENIED. It is FURTHER RECOMMENDED that the Clerk of Court be DIRECTED to enter
27 judgment for Respondent.

28      This Findings and Recommendation is submitted to the Honorable Anthony W. Ishii, United

States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days (plus three days if served by mail) after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within ten (10) <u>court</u> days (plus three days if served by mail) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:    July 7, 2008**            **/s/ Gary S. Austin**
                                    UNITED STATES MAGISTRATE JUDGE